```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
  DENNISSE G. GONELL DE ABREU,                              :    **MEMORANDUM**
                                                            :    **DECISION AND ORDER**
                              Plaintiff,                    :
                                                            :    16-cv-4892 (BMC)
          - against -                                       :
                                                            :
                                                            :
                                                            :
  CAROLYN W. COLVIN, *Commissioner of*                      :
  *Social Security*,                                        :
                                                            :
                              Defendant.                    :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

1.  Plaintiff seeks review pursuant to 42 U.S.C. § 405(g) of the decision of the Acting Commissioner of Social Security that she is not disabled and thus not entitled to disability insurance benefits. An Administrative Law Judge ("ALJ") found that she had sufficient residual functional capacity ("RFC") to do the full range of sedentary work, with slight restrictions, despite having severe impairments of a bulging cervical disc with stenosis and radiculopathy, a herniated lumbar disc with radiculopathy, gastritis, and acid reflux disease.

2.  The Appeals Council disagreed with the ALJ to the extent it found that plaintiff also had a severe mental impairment (depression), which the ALJ had rejected, but the Appeals Council held that notwithstanding this additional severe impairment, the ALJ's RFC determination and other conclusions were correct. It therefore adopted those conclusions, which became the decision of the Commissioner by operation of law. See 20 C.F.R. § 404.981.

3.  In this review proceeding, plaintiff raises two points of error: (i) the ALJ and the Appeals Council failed to properly consider plaintiff's mental impairments; and (ii) the ALJ

failed to adequately develop the record by not seeking to enforce subpoenas that he had served on plaintiff's hand surgeon.

4.  The first point of error turns largely, although not exclusively, on the weight that the ALJ and the Appeals Council chose to afford, or more precisely chose not to afford, to the opinions of Dr. Daniel Fulford, a psychologist who testified as a medical expert at the request of the ALJ on the first day of plaintiff's hearings (she had three days of hearings).

5.  Dr. Fulford's opinion was that plaintiff met the Listing of Impairments, 20 C.F.R. Appendix 1 to Subpart Plaintiff of Part 404, § 12.04 ("Affective Disorders")[1], by reason of having a "depression syndrome." If the Commissioner had accepted Dr. Fulford's opinion that plaintiff met a Listing, plaintiff would have been deemed disabled without regard to her RFC. See 20 C.F.R. § 404.1520(a)(4)(iii), (d).

6.  Section 12.04 of the Listings has two relevant parts, Part A and Part B, both which must be met. (There is a Part C but it is not involved in our inquiry.) The first, Part A, has two subparts. Part A(1) requires the presence of at least four of nine listed criteria. As an alternative to Part A(1), Part A(2) requires the presence of at least three of eight listed criteria, which are different from the Part A(1) criteria. If the claimant proves that she has at least four of the Part A(1) or three of the Part A(2) criteria, she must then show that those criteria "result in" at least two of the four listed criteria set forth in Part B.

7.  There can be no dispute that Dr. Fulford, after reviewing plaintiff's records prior to the hearing and hearing her testify at the hearing, properly recited the criteria that he found plaintiff had met to support his conclusion that plaintiff had a Listed impairment. Dr. Fulford testified that plaintiff had four of the nine criteria in Part A(1): "appetite disturbance with

---

[1] The version of Listing 12.04 to which Dr. Fulford referred, and the one relevant for our purposes, is the version of 12.04 that was in effect on January 2014, the time at which Dr. Fulford testified and plaintiff's disability claim was being reviewed. In this Order, all references to Listing 12.04 relate to the 2014 version.

2

significant weight gain," see § 12.04(A)(1)(b), noting that she had gained 50 lbs.; "sleep disturbance," see § 12.04(A)(1)(c); "difficulty concentrating or thinking," see § 12.04(A)(1)(g); and visual hallucination, see §12.04(A)(1)(i), since she had an episode of seeing "spiders on the wall."

8. He also testified that plaintiff met two of the listed criteria in Part B: "marked activity of daily living restrictions [sic] . . . ," see 12.04(B)(1), and marked difficulties in maintaining social functioning, see 12.04(B)(2). However, he was somewhat more qualified as to whether these two criteria "result[ed] from" the Part A factors that he found. As he stated it: "[With regard to] the B criteria . . . activities of daily living, again, *without speaking to causality, as many times they're not really differentiated.* We can say there is a marked activity of daily living restrictions *for whatever reason*." (Emphasis added).

9. Even without any kind of probative inquiry by the ALJ, Dr. Fulford specifically identified two records on which he relied to form his opinion that plaintiff met the § 12.04 Listing. The first was a report from a consultative psychologist, Dr. Michael Kushner, who examined plaintiff. His summary of plaintiff's self-reporting to him is essentially the same as the facts found by Dr. Fulford to support his conclusion as to the Part A(1) criteria – "great difficulty falling asleep"; "visual hallucination of spiders on the wall"; "increased appetite with a weight gain of 50 lb[s]"; and "significant amount of short-term memory trouble and concentration difficulties." Thus, if one credits plaintiff's self-reporting, there is no daylight between Dr. Fulford and Dr. Kushner as to the Part A(1) criteria.

10. Dr. Kushner also found that plaintiff's attention and concentration, and short and long term memory, were "mildly impaired." He found that plaintiff can follow simple directions and perform simple tasks, but that her ability to maintain concentration "may be impaired." He

also found that she can maintain a regular schedule and learn new tasks, and that she "may be able" to perform complex tasks under supervision. He further found that she could make appropriate decisions.

11. However, Dr. Kushner also found that "her ability to relate adequately with others and appropriately deal with stress may be impaired," and that these "difficulties are caused by psychiatric problems." He further found that plaintiff "will need assistance to manage funds because, she reports, her sister helps her manage funds." His ultimate conclusion was that his observations "appear to be consistent with psychiatric problems, but, in itself, this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." He diagnosed her with a "depressive disorder, nos," and his prognosis was "fair, given the claimant's symptoms."

12. The other record that Dr. Fulford specifically referenced was a very brief letter from a Licensed Mental Health Counselor, who stated that she had been treating plaintiff for just over a year and diagnosed her with "Dysthymic disorder 300.4." This is a reference to the Diagnostic and Statistical Manual IV (a standard which was superseded by DSM-V a couple of months later). The letter does not provide any further details as to the meaning of this diagnosis, but the DSM-VI Dysthymic Disorder diagnosis contained a number of criteria that were in some but not all ways similar to the criteria in Listing § 12.04. Principally, it required a depressed mood for most of the time on most days, with at least two of six "plus factors," including overeating, insomnia, or poor concentration or decision-making ability. It also required that these symptoms cause "clinically significant distress or impairment" in social, occupational, or "other important areas of functioning."

13.     The ALJ essentially rejected Dr. Fulford's opinion, giving it "minimal weight" because he found there was no substantiation in the record for the opinion that plaintiff had a listed impairment.  The Appeals Council, although disagreeing with the ALJ's conclusion that plaintiff's depression was not a severe impairment, agreed with his determination to give minimal weight to Dr. Fulford's opinion because, based on the overall record, "the evidence does not support a conclusion that the claimant's mental status impairment met the severity requirements of Listing 12.04."  (I do not understand why plaintiff repeatedly asserts that both the ALJ and the Appeals Council "ignored" Dr. Fulford's testimony; the ALJ discussed it more than briefly and the Appeals Court adopted most of the ALJ's findings by express reference.)

14.     The ALJ's rejection of Dr. Fulford's opinion is somewhat unusual as, in my experience reviewing ALJ decisions, most, if not all, ALJs defer to the opinion of a testifying medical expert, at least where the opinion of the medical expert is that a claimant does not meet a Listing or have sufficient RFC to preclude a finding of disability – and of course, if there is to be deference, it should not depend on whether the medical expert's opinion favors or disfavors the claimant.  It may be that the ALJ called a medical expert solely to opine as to whether plaintiff met a Listing, and may have been surprised when Dr. Fulford testified strongly to the contrary.

15.      It would have been helpful for either the ALJ or the Appeals Council to be more precise about why they believed Dr. Fulford's opinion was not supported by the record.  It would have been even more helpful if the ALJ had made at least a cursory inquiry into the basis for Dr. Fulford's opinion, instead of eliciting it and then asking no questions about it.  In addition, it would have been helpful to know Dr. Fulford's evaluation of the facts necessary to make an RFC finding, notwithstanding his view that plaintiff had a Listed impairment.

16. In the cases I have seen, the most effective testimony from a medical expert is where the medical expert expressly agrees or disagrees with key findings of consulting or treating physicians and explains the reasons for any disagreements. In the absence of such direct commentary, it is often the case that the medical evaluations are like ships passing in the night, and the ALJ is left with the somewhat speculative task of just picking one where none of the opinions explains its reasoning in enough detail to allow a confident choice between them.

17. That clearly appears to be the case here. In rejecting Dr. Fulford's opinion, the ALJ relied principally on Dr. Kushner's opinions. The irony is obvious because that is the most probative evidence relied on by Dr. Fulford as well, and he saw it quite differently.

18. The portion of Dr. Kushner's opinions that the ALJ referenced were that plaintiff has only mild limitations in daily living, social functioning and concentration, and that her psychiatric issues "do[] not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." This does seem inconsistent with Dr. Fulford's conclusion that plaintiff has "marked activity of daily living restrictions," and marked difficulties in maintaining social functioning, but because the two doctors were applying different, or at least differently worded, criteria, it is not strictly an apples-to-apples comparison.

19. Since Dr. Fulford was relying in part on Dr. Kushner, and neither doctor gave any detail as to why they considered a functional area "markedly" as opposed to "mildly" impaired, it seems to me necessary to see what in the record might form the basis for this difference of opinion. To simply pick Dr. Kushner over Dr. Fulford by broadly dismissing the latter's opinion as "not substantiated by the record," without referencing what specifically is not substantiated by the record, gives me no help in determining whether the impugned decision is supported by substantial evidence.

20. Although not directly addressing the issue expressly, the ALJ did give some indication of the basis for his choice of Dr. Kushner's conclusions over those of Dr. Fulford: "[I]t goes against the claimant's testimony." Does it?

21. The following portions of plaintiff's testimony, which the ALJ cited, support the ALJ's conclusion: plaintiff travels to doctors' appointments for both herself and her children; she takes her children to school when necessary; she does some housework with the assistance of her family, although she can only sweep, not mop; she does some cooking, although she cannot shop; she can ride the bus, but not the subway; and she assists her children with homework and goes to parent-teacher conferences. The ALJ did not reference her testimony that she does not ever go to visit friends or relatives.

22. The ALJ also mischaracterized her testimony by describing her as saying that "she had no mental health problems that prevented her from working." In fact, the ALJ asked her whether "her mental health problems prevent her from doing anything," and she responded, ". . . I don't think I have a mental health problem. What it is, is that I am very, very sad. . . . I just don't have the desire to do anything." I think the self-diagnosis of a claimant with a severe mental impairment is entitled to particularly little weight for obvious reasons.

23. Nevertheless, given the deference afforded to the Commissioner under the substantial evidence standard, see <u>Brault v. Soc. Sec. Admin., Comm'r</u>, 683 F.3d 443, 447-48 (2d Cir. 2012), I think the ALJ and the Appeals Council cannot be said to have erred in concluding that Dr. Kushner's view was correct and Dr. Fulford's was wrong. Putting aside any difficulties of daily living or socializing that may be tied to plaintiff's physical impairments (because those are not the subject of this review proceeding), I cannot see how Dr. Fulford concluded that she has "marked" limitations in daily living or social activities. There is just

7

nothing in the record that supports the conclusion that plaintiff has "marked" limitations resulting from her mental condition. All that plaintiff could say is that she is "very sad." But she seems to live fairly normally despite being very sad. Dr. Kushner seems correct, or least the Commissioner could view him as being correct under the substantial evidence standard, in concluding that plaintiff has at worst "mild" impairments resulting from her mental impairment.

24. Of course, whether a claimant's impairment meets or equals a Listing is only the third step of the five-step sequential analysis to determine whether she is disabled. If she does not meet the Listing, the ALJ must proceed to determine whether plaintiff has sufficient RFC to work either at her old job or some other job. In the instant case, however, once Dr. Fulford's views of marked limitations are properly discounted, there is again little evidence that would support a finding of disability based upon plaintiff's mental condition.

25. In reaching this conclusion, I am not persuaded that the views of plaintiff's social worker and occasional psychiatrist, on which her argument founds, are of much use to her. Everyone agrees that plaintiff is mentally impaired and depressed. The question is how impaired, and how depressed. I have to agree with the Commissioner that the record puts this case squarely within substantial-evidence land, where either result would be difficult to challenge, and that plaintiff's evaluation of the evidence simply represents a different balancing than that struck by the ALJ.

26. As to plaintiff's second point of error, I see no breach of the duty to develop the record on the facts presented here. An ALJ is required to make "every reasonable effort" to help a claimant obtain medical records from the claimant's medical sources, see 20 C.F.R. § 404.1512(b)(1), but under the regulations, two requests are considered sufficient. See 20 C.F.R. § 404.1512(b)(1)(i). Here, plaintiff had three hearings because the ALJ kept adjourning

in the hope of getting more documents. The specific documents that were not obtained, records from plaintiff's hand surgeon, Dr. Andrew Miller, were also the subject of a subpoena, which is a legally enforceable demand, rather than a request to the physician that is usually used. The subpoena itself, as opposed to requests, was more than the ALJ was required to do.

27. To the extent plaintiff contends that the ALJ was required to subpoena the records, she is simply wrong; whether to use a subpoena instead of a request is a matter of discretion. See 20 C.F.R. § 404.950(d)(1); Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). Similarly, once an ALJ determines to issue a subpoena, it is not mandatory that he bring in the United States Attorney to enforce it; that is, again, a matter of discretion. See Serrano v. Barnhart, No. 02 Civ. 6372, 2005 WL 3018256, at *4 (S.D.N.Y. Nov. 10, 2005). Thus, even though a subpoena was issued for Dr. Miller's records, there was no requirement that the ALJ seek enforcement of the subpoena.

28. What sticks in plaintiff's craw in this case is that at the second of plaintiff's three hearings, the ALJ stated affirmatively on the record that he needed Dr. Miller's records, would not proceed to a determination without them, and would seek enforcement of the subpoena. However, that interim musing was not binding on the ALJ and did not create an estoppel in plaintiff's favor; like any judge prior to rendering a final decision, he was entitled to review his predilection as to how to proceed with the case.

29. The inference is inescapable that he did so, and decided that he had a complete view of the record. Indeed, even at this late stage, plaintiff has little to say about how Dr. Miller's records of the surgery might have changed the outcome, since plaintiff's condition was treated and recorded by other providers. I can find no breach of the duty to develop the record on the facts presented here.

30. Having rejected both of plaintiff's points of error, the Commissioner's motion for judgment on the pleadings is granted, and plaintiff's motion of judgment on the pleadings is denied. The Clerk is directed to enter judgment in favor of the Commissioner, dismissing the complaint.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
      May 2, 2017